# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:09-CR-320-TCB-GGB** |
| **DONNIE ZELLNER and GRANT DECATUR ALLEN, JR.,** | |
| **Defendants.** | |

## FINAL REPORT AND RECOMMENDATION AND ORDER

Defendants Zellner and Allen (together, "Defendants") are charged with others in a conspiracy to possess with intent to distribute cocaine and two counts of possessing with intent to distribute cocaine in violation of 21 United States Code Sections 841 and 846. Defendants are also charged with two counts of possession of a firearm in furtherance of drug trafficking crimes, as well as separate counts of being convicted felons in possession of a firearm, in violation of 18 United States Code, Section 924(c) and 922(g).

Pending before this court is Defendant Zellner's Motion to Suppress Search of 920 Memorial Drive, as supplemented; Motion for Discovery of Redacted Information; and Motion to Suppress Evidence and Statements [Docs.141, 143, 150, and 151]. Also pending are Defendant Allen's Motion to Suppress Evidence and Statements, Motion

AO 72A
(Rev.8/8
2)

for Bill of Particulars; and Motion to Sever Defendant or to Sever Counts [Docs. 137, 139 and 147].[1]

An evidentiary hearing on the motions to suppress evidence and statements (Docs. 137 and 150) was held before me on August 9, 2010. My recommendations and orders on Defendants' motions follow.

## I.   FACTS FROM EVIDENTIARY HEARING

On May 23, 2008, a cooperating source ("CS"), operating under the direction of law enforcement agents, made arrangements to sell 16 kilograms of cocaine to Rodrigus Harris (later identified as Jerry Chester, and referred to herein as "Chester") in an undercover sting operation. The CS advised law enforcement that Chester and his associates would probably be armed because they had always brought guns to previous drug deals. (Tr. 7-8, 77-8, 83).

Later that day, at about 2:30 p.m., the CS met with Chester, Zellner and Allen at a Publix parking lot in Atlanta; Chester, Zellner, and Allen arrived in a black 2008 Pontiac. The meeting was surveiled by law enforcement agents, who were in radio contact with each other. After an initial conversation in the parking lot, the group

---

[1]The government filed an Unopposed Motion for Leave to File Excess Pages for the Government's Brief in Opposition [Doc. 174]. That motion is GRANTED *nunc pro tunc*.

AO 72A
(Rev.8/8
2)

agreed to proceed to a second location to conduct the exchange of drugs and money. Chester, Allen, and Zellner drove together to that location in the Pontiac. (Tr. 7-9, 77).

The surveillance team was alerted that the drug deal was underway, that Chester and the two other men were proceeding to a second location to conduct the exchange, and that they were in a black 2008 Pontiac with drive-out tags. (Tr. 9, 105).

While the CS was meeting with Chester and the others in the Publix parking lot, Dekalb County Police Department Detective F.M. Becker ("Det. Becker") was in the area in a marked police car. (Tr. 7-9, 45-6). Det. Becker was informed by radio that the subjects had met with the CS and were en route to a second location to finalize the deal in a black 2008 Pontiac with drive-out tags. (Tr. 9). Approximately three to five minutes after receiving the radio transmission, at about 2:45 or 3:00 p.m., Det. Becker observed the black 2008 Pontiac pass him at a high rate of speed. (Tr. 9-10, 36-40). Det. Becker followed the Pontiac and paced it for approximately one-half mile. He determined that the Pontiac was driving 75 miles per hour in a 55 mile per hour zone. (Tr. 9-10, 36). Det. Becker also observed that the Pontiac had a paper drive-out tag on the back of the vehicle, and that the expiration date was not securely fastened to the tag in violation of Georgia state law. (Tr. 10-11).

3

The Pontiac exited the highway, and Det. Becker activated his patrol car's blue lights. (Tr. 39-40). The Pontiac slowed to about 20 miles per hour but did not pull over until it had continued for another half-mile with Det. Becker following. Det. Becker then activated his siren. (Tr. 11-12, 41-2).

DeKalb County Police Department Detective G.M. Morrison ("Det. Morrison") pulled in behind Det. Becker in a marked patrol car. Det. Morrison is a trained and certified drug canine handler and had his trained drug detection dog ("Luca") with him.

After some period during which the Pontiac's driver (Allen) did not follow the officer's instructions to pull over to a particular area, the Pontiac ultimately followed the officers' instructions to pull into a parking lot in a park. (Tr. 13-14, 79-80, 107). Detectives Becker and Morrison pulled in behind him. Det. Becker could not see into the Pontiac's interior because the windows were heavily tinted, and he therefore did not know who else was inside the car with Allen. (Tr. 12-13, 42-3).

Det. Becker instructed Allen to exit from the Pontiac. He repeated the instructions many times and use his P.A. system, but Allen did not comply and remained in the car. Allen waived his wallet out of the window and gave Becker a puzzled look. (Tr. 12, 43).

4

Based on Allen's behavior and the CS's information that Chester and his associates were armed, Det. Becker drew his weapon, held it by his thigh pointed to the ground, and moved to the back of his vehicle. (Tr. 15, 34-5, 80)  Det. Morrison also drew his firearm and held it close to his body. (Tr. 87).  Det. Morrison stood behind his car door. Det. Morrison held his gun so that it was shielded by the car door. Det. Becker and Det. Morrison both noticed that the Pontiac's brake lights flashed on and off, indicating that the car was in gear, which indicated to them that the suspects would possibly flee. (Tr. 16, 80).  DeKalb County Police Department Detective Brink pulled up in his marked patrol car at the park's entrance, approximately 30 yards from the Pontiac, and blocked any means of vehicles exiting the park.   There were a total of three marked police vehicles and three officers at the stop.  All of the offers were in their "Battle Dress Uniform".  (Tr. 16, 48-50, 64-5, 86, 109).

After about fifteen or twenty seconds, the Pontiac's doors opened, and Allen exited. As soon as Allen exited, and Det. Becker and Det. Morrison saw that he was unarmed, they re-holstered their firearms and never drew them again during the stop. No officer ever pointed his firearm at Allen (or anyone else). Det. Becker instructed Allen to walk back to his (Becker's) car, and Allen complied.  (Tr. 16-17, 87-8, 101).

5

Once Allen reached Det. Becker's car, Allen asked what was going on. Det. Becker spoke calmly with Allen. Det. Morrison patted around the outside portion of Allen's waist area to confirm that Allen did not have any weapons on him. At Det. Morrison's and Det. Becker's directions, Allen stood next to Det. Morrison. (Tr. 17-18, 52, 107).

Det. Becker then approached the Pontiac and looked inside. He saw Chester in the front passenger seat and Zellner in the rear passenger seat. Det. Becker instructed Zellner and Chester to exit, which they did. Chester was walking with a cane or a crutch. (Tr. 18-19, 47, 65-6, 83, 108).

Det. Becker took Zellner and Chester to his patrol car. Once back at the car, Det. Becker spoke with Allen, Zellner, and Chester. Because of Chester's apparent injury, the officers allowed him to sit on the curb to take weight off his leg. Zellner joined Chester on the curb. Zellner and Chester were about five to six feet from where Allen was standing. Chester, Zellner, and Allen were allowed to stand around or sit freely. (Tr. 18-22, 51, 71, 101).

Det. Becker told Allen that he had been pulled over for speeding. Det. Becker also discussed the condition of the driveout tag and Allen's refusal to pull over despite Det. Becker's lights being engaged.

6

AO 72A
(Rev.8/8
2)

Allen responded that the music volume in the car had been turned up, and he had not seen or heard Det. Becker. With respect to the tag, Allen said that they had just driven through a car wash, which might explain the tag's condition.  (Tr. 20).

Det. Becker asked Allen where he was headed.  Allen answered that they  were driving around looking for an unknown place to purchase equipment for his game room business.   Det. Becker's exchange with Allen lasted about two minutes.  (Tr. 20-3).

Det. Becker then asked Zellner where they were driving, and Zellner said that they were on their way to take Chester to a medical clinic.  Det. Becker relayed Allen's story about looking for game room equipment, and Zellner then agreed that that was what they were doing.  Det. Becker's exchange with Zellner lasted about two minutes.  (Tr. 20-3).

In response to Det. Becker's request, Zellner, Chester, and Allen each produced identification; Chester's identification was in the name of Rodrigus Harris. Det. Becker entered the information from the identifications in his on-board computer to check their validity, as well as to determine whether any of the three men were on probation or had active warrants.  An officer also ran Zellner's criminal history during the stop and determined that he was a convicted felon.  (Tr. 21-3, 47-8, 102, 119).

AO 72A
(Rev.8/8
2)

Det. Becker asked Det. Morrison to have his trained drug dog conduct a sniff of the Pontiac's exterior.  Before Det. Morrison did so, he asked Allen if there were any weapons in the car, and Allen replied that there were none.  Det. Morrison then asked Allen if he could search the Pontiac, and Allen responded, "Not a problem. Sure. Go ahead." Allen also positively motioned with his hands, indicating his assent to the search.  (Tr. 21, 24, 51, 84, 109).

Det. Morrison then had his drug dog, Luca, walk around the exterior of the vehicle.  When Luca reached the driver's side, she alerted to the Pontiac's rear door, indicating that she detected a drug odor emanating from the car's interior.  (Tr. 52-3, 92-3, 112).  Det. Morrison then opened the rear door and smelled marijuana coming from the inside of the car.  (Tr. 94).  Det. Morrison allowed Luca to enter the Pontiac through the opened rear door so that she could sniff the area where she had detected the drug odor.  (Tr. 93, 111).  Luca gave a positive indication of drug odor emanating from the rear passenger compartment behind the drivers side seat where two bags were lying on the floorboard.  Det. Morrison looked in the bags and found two handguns in one of the bags.  (Tr. 93, 112, 120, 122-3).

Det. Morrison left the bags in the car, returned to where Det. Becker was standing, and relayed that he had found weapons in a bag in the backseat of the car

8

where Zellner had been sitting. The drug sniff by the dog had lasted approximately two minutes.  (Tr. 24-5, 68, 94-5, 113).

Det. Becker asked Zellner about the bag, and Zellner first said that it belonged to him, but then said that the bag did not belong to him. Zellner ultimately stated that a friend named Thomas Bennett had given the bag to him to hold.  (Tr. 25, 53, 67-8).

While Det. Becker spoke with Zellner, Det. Morrison and Luca walked over to the Pontiac. Det. Morrison attempted to open the trunk, but it was locked. Det. Morrison returned to where Allen was standing and asked Allen for the car keys so that he could open the locked trunk.  Allen provided the keys to Det. Morrison and did not object to Det. Morrison's searching the trunk.  Det. Morrison returned to the Pontiac, opened the trunk, and saw a cloth bag inside.  Det. Morrison turned to where Zellner, Chester, and Allen were standing and asked if the bag belonged to any of them. No one claimed the bag.  (Tr. 26, 54-5, 95-7, 114-16).

Luca then sniffed the trunk and alerted on the bag, indicating the odor of drugs emanating from it. Det. Morrison opened the bag and saw that it contained a large amount of United States currency (later determined to be over $300,000) in vacuum sealed bags. Det. Morrison placed Luca in his patrol car and returned to the Pontiac to further inspect the trunk.  (Tr. 26, 55, 96-7, 113-14).

9

Det. Becker asked Zellner, Allen, and Chester if the bag belonged to them and if they knew anything about the currency inside of it. Each of them said they did not know anything about it. Det. Morrison retrieved disclaimer of ownership forms from his patrol car, which he and Det. Becker presented to Chester, Allen, and Zellner. Det. Morrison filled in the blanks in front of the three men. The forms were read and shown to them. Chester and Zellner signed the forms in Det. Becker's and Det. Morrison's presence. The forms declared that they were not the owners of the money recovered from the Pontiac, they did not know who the owner was, and they had no interest in the money. (Tr. 26-7, 29-30, 57-8, 99-100).

When Det. Becker presented the form to Allen to sign, Allen hesitated and said that the owner of the car may have put the bag in the trunk. Det. Becker asked Allen who owned the car, and Allen stated that it belonged to a friend. Det. Becker then suggested that Allen call the car's owner. Allen declined to do so and changed his story, stating that his secretary may have placed the bag with the money in the trunk. Det. Becker reiterated his suggestion that Allen call the bag's owner, whoever that might be. Det. Becker also advised Allen that the money was going to be seized. Allen said that he wanted to call his attorney after which Det. Becker did not

10

ask Allen any other questions. Allen made a call from his cellphone. He ultimately declined to sign the disclaimer form. (Tr. 27, 31, 58, 101-2).

Det. Becker issued a traffic warning to Allen for speeding and improper display of the drive-out tag. After writing out the warning and handing it to Allen, Allen and Chester were permitted to leave, and they drove off in the Pontiac. Zellner was arrested for possession of firearms by a convicted felon. The traffic stop had lasted approximately 30 to 45 minutes. Defendants were not given <u>Miranda</u> warnings. (Tr. 31-2, 59, 102-3, 117-19).

## II.   DISCUSSION OF MOTIONS TO SUPPRESS

### A.   The Stop of Defendants' Vehicle Was Lawful

Det. Becker lawfully stopped the Pontiac because he had probable cause that the Pontiac's driver (Allen) was speeding. He also had observed that the expiration date on the Pontiac's paper drive-out tag was not securely fastened to the tag in violation of Georgia state law. O.C.G.A. § 40-2-8(b)(2)(A).

In addition, Det. Becker had reasonable suspicion that the Pontiac was en route to a drug transaction. Law enforcement officers may briefly detain an individual for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to

11

AO 72A
(Rev.8/8
2)

engage in, criminal activity. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). The <u>Terry</u> rationale also applies to brief investigatory stops of vehicles when "'justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct.'" <u>United States v. Beale</u>, 921 F.2d 1412, 1431 (11th Cir. 1991) (quoting <u>United States v. Smith</u>, 799 F.2d 704, 707 (11th Cir. 1986)). Such brief investigatory stops do not require probable cause. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). Furthermore, "reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop," not just of the officers who physically stop a car. <u>United States v. Glinton</u>, 154 F.3d 1245, 1257 (11th Cir. 1998) (citing <u>United States v. Williams</u>, 876 F.2d 1521 (11th Cir. 1989).

As part of the traffic stop, an officer is permitted to order the occupants out of the car. <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977); <u>Maryland v. Wilson,</u> 519 U.S. 408, 410 (1997). The officer is also permitted to question the occupants, even if the questioning is unrelated to the reason for the traffic stop, as long as the questioning does not prolong the stop. <u>Arizona v. Johnson</u>, 129 S. Ct. 781, 788 (2009).

Det. Becker was part of a team of officers who had at least reasonable suspicion that the Pontiac's occupants were enroute to a location where they were

going to give money to a CS in exchange for 16 kilograms of cocaine.  For these reasons, the stop of the vehicle was lawful.

**B.      Miranda Warnings Were Not Required**

Both Defendants argue that their statements should be suppressed because they were seized, yet not given Miranda warnings.  The government argues that the Defendants' statements should not be suppressed notwithstanding the absence of Miranda warnings because their statements during the stop were not the product of custodial interrogation.

The well-known general rule is that a person who is arrested and detained must be given Miranda warnings in order for his statements, made in response to interrogation by a law enforcement officer, to be used against him in court.  Miranda v. Arizona, 384 U.S. 436 (1966).  Miranda requires, among other things, that an arrestee be advised before questioning that he has the right to remain silent.  Id. at 436.  Miranda warnings are required after a person is "taken into custody or otherwise deprived of his freedom of action in any significant way" See Stansbury v. California, 511 U.S. 318, 320-21 (1994).

As discussed by Magistrate Judge King in her report and recommendation in U.S. v. Parker, 1:10-CR-0176-JEC, 2010 WL 5313758 (N.D.Ga. Nov. 18, 2010), the

13

Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, __ U.S. __, __, 130 S. Ct. 1213, 1224, __ L. Ed. 2d __ (2010). The Court stated, "We have declined to accord it 'talismanic power,' because Miranda is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" 130 S. Ct. at 1224 (quoting Berkemer v. McCarty, 468 U.S. 420, 437, 104 S. Ct. 3138, 3148-49, 82 L. Ed. 2d 317 (1984)). Accordingly, "[a]n officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" Stansbury, 511 U.S. at 322, 114 S. Ct. at 1528 (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) (per curiam)); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

The determination of whether a person is in custody for Miranda purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323, 114 S. Ct. at 1529; accord United States v. Beltran, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective beliefs of the defendant and the interviewing officer on whether the defendant was

14

free to leave is irrelevant."); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same).

Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment-and thus may be deemed to have been "seized" by law enforcement-he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .
>
> Rather, a "free-to-leave inquiry reveals *only* whether the person questioned was seized." . . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted and emphasis in original); see also Beltran, 367 Fed. Appx. at 988 (in deciding whether Miranda rights are required prior to questioning during a Terry stop, courts "consider whether the Terry stop 'exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights'") (citation omitted); United States v. Ellison, __ F.3d __, __, 2010 WL 1493847, at *2 (1st Cir. April 15, 2010) ("in dealing with a case outside the Miranda paradigm [that is, interrogation of a

suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody[,]'" the district court explained, "[t]hat is, custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda") (quoting Shatzer, __ U.S. at __, 130 S. Ct. at 1224).

"In assessing whether a reasonable innocent person in [Defendant's] position 'would have understood his freedom of action to have been curtailed to a degree associated with formal arrest,' . . . [this court] consider[s] the totality of the circumstances, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Luna-Encinas, 603 F.3d at 881 (citations omitted); and see Beltran, 367 Fed. Appx. at 988 ("Although officers may restrain an individual's freedom by placing him in the back of a patrol car, in handcuffs, or by pointing guns at him, that restraint does not automatically turn a stop into an arrest.").

Defendants Zellner and Allen argue that the circumstances were consistent with a formal arrest in that: (1) they were stopped in connection with a drug investigation; (2) there were three officers at the scene in three separate police cars;

16

(3) two of the officers had dogs; (4) the officers were armed, in battle dress uniforms, and at one point drew their weapons; (5) Allen was ordered to park in a particular spot and his exit was blocked; (6) Allen was ordered out of his car and back to the police cars; (7) Allen was told where to stand; (8) Allen observed the dog sniff of his car; (9) the stop lasted 30-45 minutes; and (10) the park where they were stopped was secluded and empty. In addition, neither Defendant was told that he did not have to answer questions or agree to the search.

However, no officer pointed his gun at or handcuffed any of the occupants of the Pontiac. The officers' guns were always pointed down and were reholstered immediately after the stop. Defendants were in a public parking lot and, for the most part, were allowed to stand around and sit freely. The officers did not raise their voices and their exchange with the Defendants was conversational. Except for a brief pat down for weapons around Allen's waist at the outset of the stop, no officer ever touched Zellner, Allen or Chester. Allen was allowed to use his cell phone to make a call, and in fact made a call to an unidentified third party. Zellner was arrested for possession of firearms by a convicted felon after the guns were found in the car, and he admitted that he was holding them for a friend; prior to that time,

17

none of the Defendants was told that he was under arrest.  Allen was allowed to drive away with Chester in the Pontiac.

While the stop lasted longer then a routine traffic stop, the length of the stop was due to the search to which Allen freely consented.   Thus, under the circumstances presented here, the length of the stop is not indicative of a formal arrest.

In United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), the Eleventh Circuit Court of Appeals refused to find that the defendant was subjected to a custodial interrogation during a Terry stop.  The court noted that the stop occurred in a parking lot of an apartment complex in broad daylight making the officers' actions visible to anyone in the area.  Although weapons were initially drawn, at the time that the defendant was questioned, all the weapons were holstered, as is true in the instant case.  Id. at 1150.   As was true in Acosta, in the instant case:

> The stop did not involve the type of "highly intrusive" coercive atmosphere that may require Miranda warnings even before a formal arrest is made.  The totality of the circumstances were such that a reasonable person in [Defendant's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.  No Miranda warnings were required at the time.

18

Id. at 1150; see also United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995)
(finding that statements made during a Terry stop were admissible, the court noted
that "we have concluded that drawing weapons, handcuffing a suspect, placing a
suspect in a patrol car for questioning, or using or threatening to use force does not
necessarily elevate a lawful stop into a custodial arrest for Miranda purposes").

In sum, based on the totality of the circumstances in this case and relevant
authority, I find that Defendants were not in "custody" requiring Miranda warnings
before they were questioned.

## III.   OTHER PENDING MOTIONS

### A.      Motion for Discovery of Redacted Information

On June 15, 2010, Defendant Zellner filed a motion for discovery of redacted
information.  At the June 16, 2010 pre-trial conference, I instructed Zellner to amend
his motion within seven days to identify the redactions that he was challenging and
explain how the information he was requesting would be helpful to the defense.  He
did not do so.  For this reason and the other reasons set forth in the government's
response (Doc. 186), this motion is **DENIED**.

19

**B.**     **Motion for Bill of Particulars**

Defendant Allen filed a motion for bill of particulars (Doc. 139) requesting

that the government be required to particularize:

> • "the objects of the conspiracy if they are other than the possession with
> intent to distribute cocaine" (Doc. 139 at 6);
>
> • "the overt acts engaged in by Mr. Allen in furtherance of the
> conspiracy" (id.); and
>
> • "whether [Mr. Allen] has been identified as a participant in any intercepted
> telephone calls or controlled buys" (id.).

The Government responds that Defendant Allen was not recorded by the

Government in any telephone calls or in-person conversations.  The government also

states that the extensive discovery produced to Defendant addresses the subject

matters covered by his motion.  The government declines to further particularize its

allegations in response to the Motion for Bill of Particulars.

"The purpose of a bill of particulars is to inform the defendant of the charge[s]

against him with sufficient precision to allow him to prepare his defense, to

minimize surprise at trial, and to enable him to plead double jeopardy in the event

of a later prosecution for the same offense."  United States v. Cole, 755 F.2d 748,

760 (11th Cir. 1985).  A bill of particulars may not be used for the purpose of

20

obtaining detailed disclosure of the government's case or evidence in advance of trial.  See United States v. Perez, 489 F.2d 51, 70-71 (5th Cir. 1973).

The court assumes that the only object of the conspiracy charged in Count One of the indictment is, as stated in the indictment, to possess with intent to distribute cocaine.  If the object of the charged conspiracy is different from what is stated in the indictment, the government should so inform the Defendants.

Beyond that, the information requested by Defendant Allen is clearly evidentiary in nature. He asks the government to detail for him each of his overt acts. The government has provided voluminous discovery, and Defendant Allen has had the benefit of an evidentiary hearing on his motion to suppress evidence at which some of the evidence against him was presented.  Under the circumstances of this case, Defendant Allen has enough information to allow him to prepare his defense and minimize surprise to him at trial.  Defendant Allen's Motion for Bill of Particulars is therefore **GRANTED IN PART AND DENIED IN PART**.

### C.      **Preliminary Motion to Sever**

Defendant Allen filed a preliminary motion for severance of parties and counts. (Doc. 147).  He argues that his trial should be severed from the trial of his co-defendants for prejudicial overspill and antagonistic defenses.  (Id. at p. 6).  As

21

AO 72A
(Rev.8/8
2)

an initial matter, the Court notes that Defendant Allen has presented no evidence of antagonistic defenses. Therefore, that argument is rejected without further discussion.

Defendant Allen does not argue that he and his co-defendants are improperly joined; rather, he relies on Rule 14 of the Federal Rules of Criminal Procedure which provides for relief from prejudicial joinder.

Rule 14 allows for severance if it appears that a defendant will be prejudiced by a joinder of offenses or defendants. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). In evaluating a motion under Rule 14, it is appropriate for the court to consider the government's proffer as to what it expects the evidence at trial to show. United States Weaver, 905 F.2d 1466, 1476 (11th Cir. 1990). Generally, defendants who are jointly indicted should be tried together. United States v. Leavitt, 878 F.2d 1329 (11th Cir. 1989). This rule is particularly applicable to conspiracy cases. United States v. Castillo-Valencia, 917 F.2d 494 (11th Cir. 1990). In order to obtain a severance of his case from that of his alleged co-conspirators, the defendant must

AO 72A
(Rev.8/8
2)

show that without a severance, he will suffer compelling prejudice and will be unable to receive a fair trial.  United States v. Puig, 810 F.2d 1085 (11th Cir. 1987). Defendant Allen has not made such a showing.  Moreover, the government represents that its facts will show that all of the defendants, including Defendant Allen, were members of the same Atlanta-based drug trafficking organization. Any potential prejudice from being tried with his co-defendants can be cured by careful instructions from the court that each defendant is to be considered separately.  See United States v. Harper, 680 F.2d 731, 734 (11th Cir. 1982).  For the above reasons, I **RECOMMEND** that Defendant Allen's Motion to Sever be **DENIED**.

### D.     Motion to Suppress Search of 920 Memorial Drive

Defendant Zellner moves to suppress evidence seized pursuant to a search warrant, of 920 Memorial Drive, Unit 25, Atlanta, Georgia ("target residence").

On June 2, 2009, Agent Douglas A. Kahn applied for and obtained from a federal magistrate judge, a search warrant for the target residence.  The warrant was executed the next day.  Defendant Zellner claims that the affidavit contains false or misleading information. In particular, according to Defendant Zellner:

> The affidavit in the instant matter is misleading because it attempts to establish that the two parallel series of events occurring on May 15, 2009, and June 2, 2009, are intertwined with the Defendant. In fact, however, they are not. The CI only observed the Defendant involved

23

with the target residence on May 15, 2009. There is no evidence to
suggest that Defendant in any way participated or was a participant to
the activities that occurred on June 2, 2009. However, the Affidavit
gives the inference that Defendant participated in both transactions.
Especially in paragraph 24, where the Affiant includes Defendant's
criminal history along with Co-Defendant Harris who was a main
participant on both dates.

(Doc. 141 at pp. 12-13).   Defendant requests a hearing pursuant to Franks v.
Delaware, 438 U.S. 154 (1978).

To be entitled to an evidentiary hearing on a motion to suppress based on
misrepresentations or omissions in a search warrant affidavit, a defendant must make
a substantial preliminary showing that the affiant made false statements either
intentionally or with reckless disregard for the truth, and that the false statements
were necessary to the finding of probable cause.  Franks 438 U.S. at 171-72.  The
above-quoted paragraph does not allege any misrepresentation or omission material
to the issue of whether contraband and other evidence would be found at the target
residence.  Therefore, Defendant is not entitled to a hearing.

Defendant Zellner also alleges that the affidavit in support of the search
warrant fails to establish probable cause.  This allegation is without merit.  The
affidavit is based on the personal observations and conversations of a confidential
source (CS). Among other things, the CS said that on June 2, 2009, he had

24

personally observed approximately forty kilograms of cocaine, cash and firearms at the target residence.  The affidavit also establishes that the CS was corroborated by law enforcement officers' seizure of approximately six kilograms of cocaine from the concealed trap of a vehicle that left the target residence on June 2, 2009.

Defendant also argues that the description of items to be seized under the warrant was overbroad in that there was no information in the affidavit that would have authorized the search for anything other than cocaine, U.S. currency or firearms.  (Doc. 141 at p. 11).

In United States v. Smith, the Eleventh Circuit found that a search warrant for "cocaine, documents, letters, photographs, business records, and other evidence relating to narcotics trafficking" was not overbroad. 918 F.2d 1501, 1507 (11th Cir.1990).  The Court stated, "Reasonably read, this language is directed to materials having a nexus to narcotics trafficking. We hold that this language meets the standards of practical accuracy that enable the searcher to ascertain and identify things authorized to be seized." Id. at 1507-1508. See also United States v. Peagler, 847 F.2d 756, 757 (11th Cir.1988) (holding that a warrant to search for "documents, records, papers, funds and any other evidence constituting trafficking in narcotics" was not overly broad and permitted the seizure of safety deposit keys.)

25

In the instant case, the items described in the search warrant were reasonably linked to drug trafficking, and are described with more particularity than the items described in the warrant in <u>Smith</u>.  Moreover, Defendant has not directed the Court's attention to any item of evidence other than drugs, currency or firearms that was seized and should be suppressed.

Finally, in <u>United States v. Leon</u>, 468 U.S. 897(1984), the Supreme Court recognized a good faith exception to the exclusionary rule for searches conducted pursuant to warrants.  The Court held that suppression of evidence would have no deterrent effect when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and has acted within its scope.  <u>Id.</u> at 919-22.  Defendant has not set forth any applicable exception to the <u>Leon</u> rule.  Accordingly, there is no basis for suppression.

## IV.   <u>CONCLUSION</u>

In sum, I **RECOMMEND** that Defendant Zellner's Motions to Suppress Search [Docs. 141 and 151] be **DENIED** and his Motion to Suppress Evidence and Statements [Doc. 150] be **DENIED**.   His Motion for Discovery of Redacted Information [Doc. 143] is hereby **DENIED**.

26

I further **RECOMMEND** that Defendant Allen's Motion to Suppress Evidence and Statements [Doc. 137] be **DENIED** and his Motion to Sever [Doc. 147] be **DENIED**.   His Motion for Bill of Particulars [Doc. 139] is hereby **GRANTED IN PART AND DENIED IN PART**.

I will certify this case ready for trial in a separate order.

It is so **ORDERED** and **RECOMMENDED**, this 14th day of January, 2011.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)